a case of Nolasco v. Garland. Mr. Tohidi, can you hear me? Yes, your honor. All right, and Mr. Finn, can you hear me? Yes, I can, your honor. Thank you. Why don't we proceed with argument. Mr. Tohidi, you're first. Thank you, your honor. Good morning and may it please the court. My name is Jasmine Tohidi and I represent the petitioner Hermann Nolasco. This case presents the court an opportunity to decide, finally, whether being a former member of MS-13 or a former member of MS-13 who left for moral reasons is a cognizable social group. In terms of asylum and withholding of removal, the sole issue before this court is whether the group is socially distinct. This court has found that that proposed group is both particular and immutable. I believe that the immigration judge abused his discretion in mixing the term of social distinction with nexus. Well, let me try to get to the core of the issue here. I think the immigration judge did have one paragraph where he mixed the particularity language up with the distinction, but then the next paragraph seems to suggest otherwise. But on that issue, what is your best evidence in the record that former MS-13 members are recognized as a socially distinct group in El Salvador? Yes, your honor. I believe this court gave a road map in Oliva v. Lynch for what evidence in this case. Yes, your honor. First, I would say El Salvador has what's called Decree 717, which is a governmental program. Part of that governmental program is to track gang members, and part of the program is to give rehabilitation and re-education programs. That's through the government. There's additionally education and trade programs given by private parties and also the government. Thirdly, the largest group would be evangelical Christians who try to extricate gang members from the gang. So specifically, in the evidence, what I'd like the court to look at is 238 to 240 of the administrative record talks about education and trade programs. 268 to 269 is a Voice of America program talking about jail rehabilitation programs to extricate gang members. And then 431 to 433 is an article regarding a gang member who MS-13 and states that evangelical Christianity is the largest acceptor of people who've left MS-13 and try to rehabilitate them. I believe this court should adopt a precedent that the existence of social and governmental programs is very indicative of the fact that that group is socially distinct. That gets a little murky because those programs are focused at MS-13 members. And the literature that I read that you attached were stories and conduct against people who had tattoos who thought they were perceived to be MS-13 members even though they may not have been. And I didn't see anything where people identified as ex-MS-13 members were treated or considered as a group of people at all. They were trying to extricate MS-13. It's a way to treat MS-13 people instead of shooting them, which there's a lot of evidence there that the police were recklessly going about in shooting MS-13 members even without process. These programs you're talking about are alternatives to extricate persons from the MS-13 sphere. But should we treat that as a recognition that there are, in fact, a socially recognized group of MS-13 people that exist in El Salvador? Yes, Your Honor. I think in two ways. One, I believe vocational programs wouldn't be to extricate individuals. I think it was to reintegrate individuals who already left the gang to allow them to have a means for living. The same thing with religion. I think they serve both purposes, like you said, to rehabilitate and take individuals out, but to also give them a community once they have left MS-13 to be able to continue to not rejoin the gang after that point. And all that it requires is that society perceive that group to be distinct. And that's why I think the threshold isn't as high. I think the immigration judge continuously mixed nexus with a social distinction stating, well, the tattoos is what makes you visible. But for social distinction, one does not need... You can have some people that show up visibly and some people that show up non-visibly. There's no question about that. A tattoo may be indicative of membership. A person wearing a beard in a certain way may be a Hasidic Jew or a person who has a turban and wears a beard might be a Sikh. In other words, there are also groups that are not, as you pointed out, gender groups and all kinds of other familial relationships and social relationships. Correct, Your Honor. So that's why I think I agree with you that some of these programs are to change individuals from gang members to former gang members. But I also think some of these group articles that I pointed out are rehabilitative to continue your path of having stayed out of the gang, particularly the Christianity, continuing to attend the church, having a sense of community. Because one of the reasons individuals tend to go back to gangs, like Mr. Nolasco testified, is a sense of family and a sense of being with a community. So these programs allow them individually to not be in that lifestyle. And I think this is... Ms. Tahiti, is it your position that all former gang members with tattoos can show a substantial risk of torture upon removal to El Salvador? All former gang members? No, Your Honor, I think you have to look at the nature of the tattoos. And second, I think it's the tattoos, the nature of the tattoos, and the fact that my client was tagged in the United States database as a former gang member. So I think the highly visible nature, there's nothing to say having a large one and a three on your arm, that's highly indicative of being MS-13. A case that I had said that was kind of analogous would be Quinteros in the Third Circuit, but there the tattoo was kind of equivocal. So I think that it goes towards a 51 percent or greater determination, but it might not be that all individuals with tattoos would meet the cat. And I think that leads me to one of the largest errors I think the immigration judge made in terms of cat, Your Honor, which he repeatedly stated twice on the record that if I grant this case, then I must grant all former gang member cases with tattoos. However, the regulations require the immigration judge to assess an individualized risk of torture, and the immigration judge should have never considered the scope of his ruling and how it would impact other individuals. In this case, then, if the court were to find that the group were socially distinct, the court would have to remand proceedings back to the Board of Immigration Appeals because the issue of nexus was not determined. But I think that this court has been grappling with the issue of whether former gang members are cognizable social groups since the issuance of Martinez, and immigration judges have been very reticent to find that that group is socially distinct or particular. But I think that it's very clear that Salvadoran society views the group as distinct because individuals wouldn't create programs and create a sense of community around individuals if they didn't see them as a group separate and apart. I kind of look at it analogous to those individuals as former alcoholics. So I would say in the same way, these social groups, yes, they prevent individuals from going back into the gang, but they also keep them separate and keep them from not going into the gang. In this case, the immigration judge found my client credible, and he did accept that he no longer was a member of MS-13 at that point. The other is a governmental program showing that at least the government itself views a former gang membership as socially distinct because one of the ways you could, in theory, go out of Decree 717 would be if you had rehabilitated and were no longer part of the gang. Another issue in social distinction that I think the immigration judge made a mistake on is he was overly concerned about whether Mr. Nolasco joined MS-13 in Virginia or El Salvador, but I don't believe Salvadoran society makes such a distinction. And second, it doesn't look at the fact that MS-13 actually originated. Sorry to interrupt you. I had a question on that point. Was there any evidence in the record about whether a former gang member from Virginia would be perceived as part of the socially distinct former gang member group in El Salvador? All the evidence I looked at in the record seemed to be about how El Salvadoran society views anyone with these markings as a gang member. You have trouble or you're retired or you're taking a break. You have trouble distinguishing yourself from the gang because society views everyone with these markings as a gang member. I don't recall seeing much about gang members from other places or former gang members from other places, but I wanted to ask you if there was something in the record about that. Yes, Your Honor. I think again that's where Decree 717 comes into play because that program is specifically targeted towards also tracking deportees who have been deported from the United States. And two, because there's the criminal history information sharing program between the government of the United States and the government of El Salvador that specifically transmits information for individuals who've been deported that have ties to gangs. That shows that El Salvadoran society at large doesn't care about the origin stories of where the individual joined the gang. And like I stated, MS-13 actually originated from the United States. And that doesn't have to do with former. It's not just former gang members, right? That's the reason that these databases and these tracking systems are in place is because of evidence that shows that former gang members are a distinct group rather than, you know, they're trying to distinguish themselves from members of the gang. But the evidence that I looked at seemed to suggest that that's a difficult thing to do in El Salvadoran society. So I think that goes towards whether an individual would trust that you've actually left the gang. But again, as I said previously, I think, for instance, vocational programs, teaching people who've left the gangs to get new jobs, to find new ways to make income, is indicative that we see them as former and distinct. The same thing with Christianity, attending church, a certain point continually to go to church over time, again, shows a commitment that you're a former member. So I do understand in some of these programs, it's a rehabilitative change to change someone from a current gang member to a former gang member. But the vocational and trade programs are geared towards individuals who have been identified as former members of MS-13. Additionally, like I stated in the article in The Intercept, the individual was a former gang member and the police didn't believe that he actually had left the gang and stated individuals like you use Christianity as a way to fool us. But I think that still shows that society views former gang members as distinct, whether or not they believe that you are a former member, I don't think goes towards the issue of social distinction. I think that would go towards an issue of nexus. Would I persecute you on account of the fact that I think you're former or because I believe you're a current gang member, Your Honor? I'm sorry, I didn't mean to interrupt if Your Honor had another question. Oh, no. Okay. And then Your Honor, I would like to briefly touch on convention against torture in this case. I believe the record had ample evidence that Mr. Nolasco would be tortured in this case. The country condition report specifically references the murder of suspected gang members. This case is separate and distinct from Singh v. Holder or violations can't carry the burden for Kat because you couldn't look at generalized conditions. In this case, the record had ample evidence that individuals who are suspected gang members were tortured by governmental forces. The immigration judge didn't give a reasoning as to why looking at all the factors and considering Rodriguez v. Whitaker that he couldn't meet his references on 202 and 204, the killing of suspected gang members. It was actually in the executive summary of that report, which states that it's one of the most important things that they're looking at. Additionally, El Salvador decided to omit homicide data of when the police have a shooting or kill gang members. And that was at 335. So I think too, it shows that the they no longer want to account for the information of how many individuals were actually killed by police forces. There was the article by CNN at 422 to 433, which stated that there was a group of police officers who were murdering individuals suspected of being gang members. When they were found out instead of firing those police officers, they reassigned them to a new police unit. So I members won his tattoos and the transmission of that evidence and that Ms. 13 will kill him for believing that he won't rejoin the gang. 18th Street would try to kill him because he's a rival gang member. And the police would try to kill him because that's how they're dealing with individuals who are suspected gang members in El Salvador. So I think he's amply met his 51% or greater chance. And the immigration judge was overly concerned with the scope of his decision and tattooage versus the facts of this case. And your honors, I'm almost out of time. Is it a legitimate concern under any of the analysis which you've laid out to worry about the fact that with applying the analysis as you've set it forth would require us to retain every Ms. 13 member, whether he's a current member or an ex member. In other words, we could never deport an Ms. 13 member because as part of the condition of being a member, you get these tattoos and having the tattoos that identifies you as a former member. And as you know, Ms. 13, criminal history is particularly vicious. We get lots of cases up here on Ms. 13 and they are very, very difficult criminal cases. So the question I have, is it a legitimate concern under any of these analyses to whether every Ms. 13 person would then get harbor in the United States? Now, under what you're saying, we could never deport another Ms. 13 person to El Salvador. No, your honor. So I think again, for like risk of torture, it has to be an individualized risk. But the risk you're identifying is individualized to every Ms. 13 person, whether existing a member or an ex member. Because the reason that he's treated that way in El Salvador is because people see the, they pull up the shirt and they see the tattoo and they shoot him. Or they see he's got a Ms. 13 gang and it's another gang kills him. That's your argument. And the question is, doesn't that apply to every Ms. 13 person in the United States? So your honor, I would say no one, the tattooage that my client has is highly specific to Ms. 13. So I would one at Quinteros, where you had a tattoo that required an expert. That's a possibility, but I'm going to tell you almost everybody gets a tattoo that identifies themselves with Ms. 13. Now that didn't happen in that one case. That's an exception. But the whole purpose of the tattoo is to identify the person with the gang and to make a commitment to the gang that's permanent. And he's told he cannot leave the gang. And if he does, the gang leader gives the green light and any member then can shoot him. And that happens in the Baltimore, Washington area, Long Island area, Los Angeles. I mean, there's these centers where Ms. 13 is pretty well organized. And I wonder, my question to you remains is if we were to conclude that your analysis would require us to harbor every Ms. 13 person based on the fact that they, that person has an identifiable tattoo linking them to Ms. 13, would we, is it legitimate for us to be concerned that we could never deport an Ms. 13 member? I think your honor, the country conditions make it so that I believe former members of Ms. 13 have a more likely chance to have a cat claim than I would say other Salvadoran individuals. But I would still go towards the fact that it's very individualized on how visible is this individual as a member of Ms. 13, what's going on with the current Salvadoran government and to not all individuals who have been associated with Ms. 13 have arrests and convictions for street gang participation like my client does. So as you've noted, Ms. 13 too has different kinds of higher hierarchy. So I think in this case, my client is more likely based on his individualized facts and to the current government. But none of those facts come into your analysis. We don't look at whether he's got a criminal record here. We're deporting him for whatever reason we're deporting him. But my point is the individualized analysis that you're calling for, there's nothing that under that analysis that distinguishes an Ms. 13 person who has an identifiable tattoo or tattoos. Usually it's multiple tattoos linking them with Ms. 13. I say that's the problem, but what you're saying is there is an answer because it's individualized, but I'm trying to say the analysis you offered is not individualized. It's systemic. Correct. So if your honor is concerned about the scope of it, still I think remand would be appropriate because the immigration judge abused his discretion by repeatedly making the statements in this case of stating, if I grant this case, I must grant all Ms. 13 former gang member cases rather than looking at it. And my question is, is that illegitimate? I believe the scope could be broader. Yes, your honor. But I think you have to look at the individual. But we're not allowed to consider that either then. In our review of your case, we're not allowed to analyze or be concerned about the fact that it's going to have a universal effect. Because I don't believe it would have a universal effect, your honor. What if we concluded it would? I mean, immigration practitioners would be happy with that, but I don't think that it requires that under CAP because you have to look at each individual's circumstances. And the government of El Salvador can always change and stop tracking and murdering people that they view to be former members of Ms. 13. So even for a short period of time, if it was more likely than not that some of these individuals will be targeted, it doesn't mean that forever in time that they would be entitled to relief, your honor. Okay, thank you. Mr. Pham? Yes, thank you, your honor. I'll start at that point of the discussion, which is essentially the Ortega case. Okay, in the immigration judge's decision, he directly referred to the Ortega case and said, this is non-controlling. But he appreciated the analysis in the Ortega case. When we get to the board, the board similarly cites in a compare site, the Ortega case and cases from the sixth circuit and the first circuit. Neither the board or the immigration judge cited those cases as controlling. What they did was the factual analysis required to determine whether the petitioner had proposed a particular social group that was in fact socially distinct, which is a question, a mixed question of law and fact. So unlike the question of particularity or immutability, which may be definitional and therefore purely legal questions, social distinction requires a showing a factual basis upon which to apply the legal standard. And I think at that point, I would also note that what this case also brings into play is the issue that the petitioner's counsel here has noticed that like in Alcoholics Anonymous, there's a question of how do we define this group? How is this group perceived socially? If I remember correctly, even people who are in Alcoholics Anonymous, who are moving along and are no longer having a significant problem, still go to meetings and admit at the beginning, I'm an alcoholic. So this question of what is a gang member and a former gang member on this record is not clear. Because the Intercept article, which was the primary document that was being argued before the immigration judge, the Intercept article is of itself confusing. The subject of the article attempts to leave the gang, knows that he can't leave the gang in a sense. The gang he asked to leave, but he gets pulled right back in. How does that demonstrate that El Salvadoran society sees him to be either a gang member or a former gang member? It does not. It definitely shows that the gang doesn't make such a great distinction. They may have a formal process that is described in the article about how someone distances themselves from the gang, but they also have a process to bring people back in. And that's the question. Even here, even here, it's not clear because we're looking at the question of social distinction from the perception of the persecutor, the gang itself. So, you know, the case law is clear on that. MEVG or WGR discuss very specifically the problems of seeing a distinct social group from the perspective of the persecutor. The evidence in this record does not support a finding that a former gang member is a category or a group of people that are discreet in a significant way in El Salvadoran society. The record makes many references to ex-members, you know, people that are in different positions as to their relationship to the gang, but it does not make a clear distinction about what the society sees. To the extent there's reference to the evangelicals, the evangelical community, I should say, in El Salvador, the Intercept article makes clear that this particular subject of the article aligned with an evangelical community. They knew of his past and he had a mentor. What it does not show is that the entire evangelical community makes a distinction between former and active gang membership. All it says is that in this one instance, as proof that for this case here, I guess, in this one instance, they were willing to work with this person to bring him into their evangelical community and help him improve his life. But again, he went back to the gang eventually. Former membership really is a difficult and strained concept. Much of the argument before the immigration judge did center on this question of the tattoos, the visibility of the tattoos. And so I think as we read the his discussion of social distinction, and he moves to the question of the tattoos, I think that has to be read in light of the record transcript itself and of the arguments made in the closing portions of the hearing. Because the fact that he had these tattoos that evidenced his and he returned to El Salvador as a former gang member, he was in any danger. The membership, as Judge Niemeyer pointed out, these are essentially marks put on the gang member by the gang to affiliate that person with the gang for life. And as such, if the immigration judge discussed the tattoos in that context, I think he was reacting to very much the presentation that he had had before him at the marriage hearing, to include having the petitioner stand up, reveal his tattoos, and significant discussion during the course of argument by both Petitioner's Council and the DHS Council about what the meaning of the tattoos was. I do believe for the context we have here today, though, the tattoos have much more bearing on the question of Kat, because in fact, that is a reasonable consideration in terms of his future likelihood of torture. But I don't think it was improper for the immigration judge to divert his discussion on social distinction, because that very much reflects what was going on in the marriage hearing. And I think he was trying to make sure he was complete in his consideration of the subjects that were addressed to him at that hearing. I've already discussed the intercept article. I would also note there was a discussion of an article I will call the Florida International University Study, which was submitted by the DHS, which was a survey of gang membership, and Petitioner's Council referred to that in her briefs. I would note that the Florida International University Study can be found at Joint Appendix, page 292. That study was a survey of gang members and former gang members, but the study itself doesn't define what it means by a former gang member. So we're now in the same position of we're looking at this case from the perspective not of El Salvadoran society, but of gang members themselves. And even in that article, it confuses and discusses multiple standards, just different positions gang members can be in in relation to the gang. It's not simply gang member, former gang member. I would propose that, as I said in my brief, that gang membership from the perspective of the society is not so discreetly broken down. Gang members are gang members. That's what the record seems to support. I would note on this question of Decree 717 that that is a decree, and this was counsel in her closing argument as well before the immigration judge, that the applies to dangerousness. And it's not such a simple statement of they're going to necessarily have human rights abuses that relate to Degree 717 or other rehabilitation efforts for deportees are returning. The Kirkland article, which is at Joint Appendix 417, seems to suggest that, in fact, human rights abuses occur directly because of Decree 717 or the report return of deportees. But as DHS counsel pointed out in her closing argument, the footnote cited in that study in Kirkland article does not support whatsoever the assertion of human rights abuses directly related to Decree 717 or the return of deportees via information sharing from the United States. In fact, the materials from the Department of State, materials from ICE that are in the record, indicate that the American side of that equation, or I should say the United States side of that even for those people they're returning. However, it also recognizes the dangerousness of returning gang members into their society. After all, these are part of a larger criminal enterprise. As for the issue of El Salvadorans, how they perceive persons who are not from El Salvador. I remembered that the issue really is not whether there was a specific way of identifying, but there's an absence of proof here. There's an absence of proof that petitioner would, in fact, under the circumstances, facts provided in this case, be, in fact, seen as a former gang member in El Salvador. We don't know. It's just an absence of proof. Therefore, I think in that situation, as we talked about earlier, the social distinction requirement is both a factual and a legal inquiry. An absence of proof goes to a problem in their presentation of the evidence, and they have not supported their assertion that former gang member is a cognizable group with respect to the issue of social distinction. I would note that it's not surprising, before I turn to Kat, it's not surprising that there's always skepticism or difficulty for both the immigration judge and the board in here with the idea that membership in a gang could create a refugee status for a person. But the PSG analysis is, for purposes of social distinction, is a factual analysis. And in this case, our argument is not broad. This record does not support a finding the petitioner established his particular social group because the facts to support social distinction are absent. Unless there are social distinction arguments, I will move forward into the Kat question. There are really two issues here, and that is whether the record, the decision of the immigration judge and the board is supported by substantial evidence and whether they gave the evidence reasoned consideration. The substantial evidence, I believe, I will say simply that there is very to no particularized evidence of petitioner's likelihood of future torture in El Salvador. He hasn't been in El Salvador for 25 years. He's not traveled there. His entire gang membership has been in Virginia in the MS-13 gang. To the extent there's a question of substantial evidence, I would note that the immigration judge had quite a bit of evidence before him, not only from petitioner's counsel, but from the Department of Homeland Security. They submitted a robust package of rebuttal evidence that petitioner's counsel, or excuse me, DHS counsel on the record clarified for the immigration judge. We submitted evidence that postdated Rodriguez-Arias specifically because we wanted to be current and rebut the type of information that supported the petitioner in Rodriguez-Arias. In other words, the DHS didn't stop here. Substantial evidence and the question of whether this record would compel a reasonable fact finder to find to the contrary, I don't believe has been made out nor can it be made out on this record. The record very much supports the finding that there has not been a showing that petitioner himself is subject to future torture, a likelihood of future torture upon his return to El Salvador. The last comments I'll make on the CAT is the question of consideration. And here, the immigration judge did specifically reference petitioner's evidence of country conditions and the intercept article. The intercept article was the focal point of the closing argument by petitioner's counsel. The immigration judge addressed that article specifically and went on to discuss the country conditions evidence, but was concerned of course with the ability of a petitioner to submit just broad amount of country condition evidence with tattoos and said he was wrestling with that. So I think the question in reason consideration is, did he consider it? And first of all, there's a presumption that the immigration judge did consider that evidence. So the really, the proof has to be that he did not. And I believe there is enough in that the board specifically referenced the immigration judge's decisions citing to the factual findings on the CAT claim, specifically at page five of the joint appendix. It went through and went through the findings of the immigration judge that the evidence revealed that their efforts to combat corruption, there is violence, there is corruption, it remains a problem. But that the petitioner himself had not established his CAT claim was sufficient evidence. I don't believe there's anything in the record to indicate that the immigration judge ignored the evidence, which is the basis of the Quinteros case out of the Third Circuit. In that case, it was very clear in the finding in Quinteros, and I would cite there to the record at 787 of the very clearly there were substantial factual findings ignored by the immigration judge. In fact, they were wrong. The board had in fact found that the, had not shown he was likely to be identified. We've made no argument here that the petitioner wouldn't be identified by gang tattoos or that he would be discovered because he can be covered. The immigration judge pushed that you can cover tattoos, but he never said, he never said that that negates or would not support his claim. So, unless there are any additional questions, that concludes my argument today. Okay. Thank you, Mr. Fanning. Ms. Toheda? Um, so I just wanted to follow up on two brief points. One, Ortega in the Ninth Circuit was actually found not credible. And two, this court characterized it in Martinez as stating that Mr. Ortega was actually a current gang member, not that he was a former member of MS-13. So, I think that case one is inapplicable here as precedent because one, it looks like this court has rejected it in Martinez and it deals with active gang members rather than individuals who have left. Also, respondent has brought up, how do you know who's a former gang member, who's a current one? I think that goes towards the question of particularity, which they have conceded. I don't think a Salvadoran society as interested on whether you're retired or former. And again, I would just go back to the fact that the country conditions show that the society views this as a distinct group set apart from the population as a whole. And then in terms of CAT, the immigration judge stated, yes, country conditions are improving, but did not look at the fact that are they improving for this disfavored group of former gang members? So, a country might be making strides in other areas, but may still persecute certain individuals. For instance, there are certain countries, let's say Sierra Leone, which may persecute people who are gay, but wouldn't persecute the population as a whole. So, I would say the same thing kind of goes for a CAT for Salvadorans, which is the government may be making strides to improve its judiciary or things like that, but they aren't improving the corruption of killing former gang members. The 2017 and the 2018 report both showed that the murder of gang members is still a problem within El Salvador showing that they haven't been improving. Just to clarify, you said the murder of gang members, and I think you're right. That is what the evidence shows, but what is the evidence about former gang members as a discrete group who are targeted for torture? So, I believe for purposes of CAT, it doesn't matter whether you're viewed as former or current. So, all that matters is you're targeted because I don't have to show a protected ground. So, in that case, it doesn't matter that the government views them as a current gang member or distrusts their word that they have left the gang. But it's the same evidence, right? That you're using the same evidence for both the CAT and the asylum. That's the same evidence, I would say, but in this case, this court can't come to the issue of nexus or whether there's a well-founded fear because the board didn't address that. So, the only issue in terms of asylum is just whether or not that group is distinct. And I think looking at the country conditions in totality and his testimony, that he's met just the fact that society sees it as socially distinct. And secondarily, I think he's met his burden for CAT. And even if that means that several gang members or former gang members are granted CAT, that doesn't negate the fact that they can meet the 51% or greater risk of torture. And the United States has other means to track those individuals. Additionally, with CAT, if country, you could send someone to a third country or you can come back to court if country conditions change and try to remove that individual. So, being concerned about the scope, I think, goes contrary to the convention against torture. And if your honors don't have any more questions, I'd like to rest on my brief. Thank you. Thank you. Appreciate the arguments. Our practice is to come down and shake your hand and thank you for your arguments. And if either of you have been before our court before, you recognize that that is, I think, a nice touch. And we'd love to do that now. We can't. So, we're doing it virtually and thanking you for your arguments and hope you come before us again. And at that time, we will shake your hand and talk to you about baseball or whatever you want. Thank you, your honor. Thank you, your honor.
judges: Paul V. Niemeyer, Henry F. Floyd, Allison J. Rushing